IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SMART OIL, LLC,

                    Plaintiff,

          v.

DW MAZEL, LLC,

                    Defendant.

Case No. 15 C 8146

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Smart Oil, LLC ("Smart Oil") and Defendant DW Mazel, LLC ("DWM") cross-move for summary judgment on Counts I and II of Smart Oil's Complaint. DWM also moves for summary judgment on Counts I and II of its Counterclaim. For the reasons stated herein, DWM's Motion (Dkt. No. 74) is denied, and Smart Oil's Motion (Dkt. No. 71) is granted as to Count I of the Complaint. Count II of the Complaint is moot.

## I.  UNDISPUTED FACTS

For convenience of the reader, the Court provides both a succinct summary and a more detailed overview of the facts. The following facts are undisputed unless designated otherwise. Lastly, since this case deals with a contractual dispute, the Court will provide the specific contractual provisions at issue when relevant throughout the Opinion.

First, a summary: This lawsuit arises out of a contractual dispute between a buyer, DWM, and a seller, Smart Oil, concerning a November 2, 2014, Purchase and Sale Agreement and Joint Escrow Instructions (the "November Agreement" or "Agreement"). The purpose of the November Agreement was to sell thirty parcels of real property, including gas stations and convenience stores. As part of that Agreement, DWM was required to pay an initial deposit of $300,000.00 ("Deposit") to the Initial Escrow Holder, Jeffrey Zwick & Associates ("Zwick"). The November Agreement required Zwick in turn to transfer the initial deposit to the Title Company Escrow Holder, which the Agreement designated as First American Title Insurance Company ("FATICO"). It also provided that DWM was to pay a subsequent deposit of $450,000.00 ("Additional Deposit") to FATICO at the close of the Due Diligence Period on November 30, 2014. As it turns out, DWM never paid the Deposit or the Additional Deposit. DWM's failure to make such payments led Smart Oil to file the instant action for breach of contract. Smart Oil seeks to enforce its right to the deposits in the total amount of $750,000.00.

Now to dig into the finer points. During 2014, Mehmood Syed, the sole member of Smart Oil and the President of Syed Brokerage & Capital Co., organized and marketed the proposed sale of numerous gas stations, convenience stores, and real properties. (Def.'s Resp. to Pl.'s Stmt. of Material Facts ("Smart Oil SOF") ¶ 5,

Dkt. No. 82.) DWM contracted with Syed Brokerage & Capital Co. and entered into an initial Purchase and Sale Agreement and Joint Escrow Instructions on June 11, 2014 (the "June Agreement"). (Pl.'s Resp. to Def.'s Stmt. of Material Facts ("DWM SOF") ¶ 1, Dkt. No. 79.) As part of that initial agreement, DWM had deposited $250,000.00 with the Title Company Escrow Holder Zwick on June 6, 2014. (DWM SOF ¶¶ 3-4.) That same day, Zwick confirmed that his firm was "holding $250,000.00 for DW Mazel LLC in connection with its proposed purchase of a portfolio of 25 gas stations located throughout Illinois, from Smart Oil LLC." (Zwick Email #1, Ex. B to Def.'s Mot. for Summ. J., Dkt. No. 75-2.) On July 11, 2014, however, that agreement was declared null and void. (Smart Oil SOF ¶ 10.)

On November 2, 2014, Smart Oil and DWM executed a second Purchase and Sale Agreement and Joint Escrow Instructions—the November Agreement. (Smart Oil SOF ¶ 12; Purchase and Sale Agreement and Joint Escrow Instructions ("November Agreement"), Ex. D to Def.'s Mot. for Summ. J., Dkt. No. 75-4.) That Agreement serves as the crux of this lawsuit. The purpose of the Agreement was for the purchase and sale of thirty parcels of real property for $67,000,000.00, (*Id.*), but the transaction never closed (Smart Oil SOF ¶ 43). Prior to the consummation of the transaction, however, the Agreement provided for the Deposit of $300,000.00 and the Additional Deposit of $450,000.00, which combined constituted

the "Earnest Money Deposit" of $750,000.00. (Smart Oil SOF ¶¶ 17-19; November Agreement 2.) The Agreement explicitly designated Zwick as the Initial Escrow Holder and established that the initial escrow was to take place during the Due Diligence Period—the period for investigations and potential negotiations following the acceptance of the November Agreement. (November Agreement 2-3.) According to Smart Oil, DWM's Deposit of $300,00.00 was due by November 2, 2014. (Smart Oil SOF ¶ 17.) DWM disputes this statement and asserts that such payment was dependent on Smart Oil's satisfaction of conditions precedent, which Smart Oil allegedly failed to satisfy. (*Id.*) Regardless, at the close of the Due Diligence Period—November 30, 2014—the Agreement required Zwick to transfer the Deposit to the Title Company Escrow Holder, FATICO. (November Agreement 3.) The Agreement also directed DWM to remit the Additional Deposit of $450,000.00 to FATICO at the close of the Due Diligence Period. (*Id.*)

The November Agreement acknowledged that DWM had already deposited $250,000.00 per the parties' initial agreement in June, and thus only required DWM to remit an additional good faith deposit of $50,000.00 to satisfy the Deposit. (November Agreement 2.) Apparently, DWM never paid this difference. (Smart Oil SOF ¶ 28.) But despite having failed to do so, on November 3, 2014, Zwick emailed DWM, stating: "This shall confirm that as of today, I am holding $300,000.00 for DW Mazel LLC in connection with its

proposed purchase of a portfolio of 30 gas stations located throughout Illinois, from Smart Oil LLC. And the monies shall be held in accordance with the Purchase and Sale Agreement execute [sic] on November 2, 2014." (Zwick Email #2, Ex. E to Def.'s Mot. for Summ. J., Dkt. No. 75-5.) That email was addressed to several individuals, including the President of DWM David Ebrahimzadeh, who then forwarded the email to Syed. (*Id.*) As it turns out, Zwick was not holding the $300,000.00. (DWM SOF ¶ 26.) The email was somewhat of a hoax, the reasons for which the Court is uncertain.

As far as the Court can determine, Zwick had returned the June Agreement deposit of $250,000.00 to DWM at some point in July 2014. (Smart Oil SOF ¶ 11.) But neither Zwick nor DWM notified Smart Oil that the deposit was returned, and that Zwick no longer held any funds in escrow. (Smart Oil SOF ¶ 26.) For its part, DWM contends that Zwick's email was only a draft never intended to be sent to Smart Oil, yet DWM fails to explain why the email was then forwarded to Syed. (Smart Oil SOF ¶ 27.) Either way, DWM remitted neither the Deposit nor the Additional Deposit to FATICO, as specified by the November Agreement. (Smart Oil SOF ¶ 28.)

By the close of the Due Diligence Period on November 30, 2014, DWM was required to provide written notice to Smart Oil if DWM, as a result of its due diligence investigations of the properties, disapproved of the purchase. (November Agreement 4.) Such notice would terminate the Agreement and return the Earnest Money Deposit

to DWM. (*Id.*) Without any such notice, the Agreement presumed DWM was satisfied with its due diligence investigations, thus entitling Smart Oil to the Earnest Money Deposit regardless of whether the parties consummated the transaction in full. (*Id.*) By the November 30th deadline, Smart Oil asserts that DWM never provided any such notice of disapproval. (Smart Oil SOF ¶ 32.) DWM disputes this and points to subsequent emails between the parties, asserting that those emails extended the Due Diligence Period and ultimately terminated the November Agreement. (DWM SOF ¶¶ 29-31.) DWM states that, by responding to DWM's emails asking for an extension and continuing negotiations of the transaction, Smart Oil effectively rendered the Due Diligence provisions inapplicable.

Due diligence investigations, requirements, and deadlines aside, the parties continued to negotiate closing the transaction over several months. To effectuate the November Agreement, Syed contacted the respective property owners about selling their properties to Smart Oil, which Smart Oil would then sell in the aggregate to the ultimate purchaser—in this case, DWM. (Smart Oil SOF ¶¶ 35-36.) This form of transaction is known as a "flip deal." (Smart Oil SOF ¶ 37.) According to Smart Oil, all of the parties involved understood that this was how the transaction was to take place. (*Id.*) Section 17(c) of the Agreement itself states: "**The parties acknowledge that Seller is the holder of a portfolio of**

**gas station businesses, real estate and/or leases and only nominal title holder for purposes of transferring title to the Buyer. Any and all liability or obligation of Seller rests ultimately in each affiliated gas station owner or title holder.**" (November Agreement 16 (emphasis in original).)

The November Agreement was initially set to close in early December 2014. (Smart Oil SOF ¶ 39.) Prior to that time, Smart Oil and the property owners executed contracts to effectuate the sale of the properties. (*See generally* Exs. H–K to Def.'s Mot. for Summ. J., Dkt. No. 75-7-10) These contracts included documentation for the transfer of title. (*Id.*) But Smart Oil and DWM ultimately did not close the deal, nor did they anticipate or schedule the closing of the deal after the initial December deadline. As a result, the property owners never sold their properties to Smart Oil. (*See generally* Affs. of Property Owners, Ex. K to Def.'s Mot. for Summ. J., Dkt. No. 75-10.) The parties dispute, however, whether Smart Oil had authority to transfer title of the property and whether the property owners would have sold their properties if the transaction indeed closed. (Smart Oil SOF ¶ 42.) Smart Oil provides sworn affidavits and testimonies by the owners, who assert that they were ready, willing and able to sell their properties at the close of the deal. (*See generally* Affs. of Property Owners.) DWM points out that Smart Oil has not procured contracts and sworn

affidavits for all property owners, albeit Smart Oil has done so for many or most of them.  (DWM SOF ¶ 38.)

Finally, the Agreement specified that FATICO would serve as the title company for the transactions. (November Agreement 6.) DWM refused to proceed with FATICO and instead insisted on a smaller, local New York title company called Atlantis Organization. (Smart Oil SOF 45.) As far as the Court can tell, notwithstanding the terms of the Agreement, Smart Oil and DWM eventually agreed that Chicago Title would ultimately perform the title searches and title commitments and that Atlantis Organization would then handle closing and escrow in connection with the transaction. (*Id.*) Smart Oil asserts that, in November 2014, Chicago Title performed the title searches and prepared title commitments for closing. (Smart Oil SOF ¶¶ 46-47.) Chicago Title then allegedly sent those commitments to Smart Oil's lawyer, who held on to them in preparation for closing the transaction under the November Agreement. (*Id.*) DWM disputes, however, that any such title commitment searches ever took place. (*Id.*)

As should be clear by now, the transaction never closed. As a result, Smart Oil brought this suit, claiming that DWM breached the November Agreement and that it is entitled to the Earnest Money Deposit of $750,000.00. In response, DWM brought counterclaims for both breach of contract and fraudulent inducement, claiming that Smart Oil failed to perform conditions precedent to the Agreement

and fraudulently induced DWM into the Agreement at the outset. Both parties now move for summary judgment as to Counts I and II of Smart Oil's Complaint, and DWM moves for summary judgment as to Counts I and II of its Counterclaim.

## II. <u>ANALYSIS</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering Smart Oil's Motion for Summary Judgment, the Court construes the facts in the light most favorable to DWM, and when considering DWM's Motion for Summary Judgment, the Court construes the facts in the light most favorable to Smart Oil. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

### A. Breach of Contract

Smart Oil contends that DWM breached the November Agreement by failing to pay the required Earnest Money Deposit of $750,000.00. Under Illinois law, a plaintiff asserting a breach of contract claim must prove: "(1) the existence of a contract, (2)

the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626 (7th Cir. 2013) (internal quotation marks and citation omitted).

Both parties agree that a contract existed: the November Agreement. They disagree, however, over whether Smart Oil performed the conditions precedent required by the November Agreement. A condition precedent is "one that must be met before a contract becomes effective or that is to be performed by one party to an existing contract before the other party is obligated to perform." *Catholic Charities of Archdiocese of Chi. v. Thrope*, 741 N.E.2d 651, 653 (Ill. App. Ct. 2000) (citation omitted). Here, the relevant provision, Section 17(a) of the November Agreement, states:

> IF, FOLLOWING THE EXPIRATION OF THE DUE DILIGENCE PERIOD AND FINANCING PERIOD AS APPLICABLE, BUYER FAILS TO CONSUMATE THIS TRANSACTION AND CLOSE THE ESCROW ON OR BEFORE THE CLOSING DATE (**WITHOUT FAILURE OF ANY CONDITIONS PRECEDENT IN FAVOR OF BUYER**), SELLER SHALL BE ENTITLED TO THE ENTIRE DEPOSIT . . .

(November Agreement 14-15 (emphasis added).) Section 4 of the Agreement provides that "Buyer's obligation to consummate the transaction contemplated by this Agreement are [sic] subject to the timely satisfaction or written waiver of the following conditions precedent for Buyer's benefit." (November Agreement 4.) Those conditions precedent include: (1) due diligence

investigations and materials; (2) title insurance commitments for each of the properties; and (3) inventories of the personal property for each of the businesses. (November Agreement 4-6.) Additionally, Section 15 of the November Agreement provides a series of representations and warranties, which assert:

> In consideration of Buyer entering into this Agreement, and as an inducement for Buyer to enter into this Agreement, Seller makes the following representations and warranties, **each of which is material and is being relied upon by Buyer** (and **the truth and accuracy of which shall constitute a condition precedent to Buyer's obligations hereunder**).

(November Agreement 15 (emphasis added).)

DWM's argument regarding these provisions is twofold: (1) Smart Oil did not have valid contracts with the property owners to sell their properties, including the gas stations and businesses located thereon, and (2) Smart Oil failed to provide DWM the required due diligence materials to effectuate the November Agreement. Thus, Smart Oil allegedly failed to satisfy the conditions precedent, which resulted in Smart Oil's breach of the Agreement, not DWM's. The Court will consider Smart Oil's authority to enter into the Agreement and its due diligence performance separately.

## 1. Authority to Convey Property

DWM contends that at the time the parties executed the November Agreement, Smart Oil did not have the authorization or legal rights to convey the thirty parcels of property. In support

of its proposition, DWM presents a dizzying array of factual assertions, but the Court need not delve deep into these assertions for the answer is straightforward.

Solely for purposes of enforcing payment of the Earnest Money Deposit, Smart Oil has demonstrated that it had adequate authority to enter into the Agreement. Smart Oil provides the property owners' sworn statements, which assert that Smart Oil had authority through Syed to purchase the respective properties and that the owners understood Smart Oil would then "flip" the properties to the ultimate buyer—in this case, DWM. Also, these owners testify that they were ready and willing to sell their respective properties in December 2014, in accord with the November Agreement. Construing the facts in the light most favorable to Smart Oil, the parties to the Agreement and the property owners were well-aware that Smart Oil was not to fund the transaction, but rather to facilitate the transfer of title from property owners to DWM. Smart Oil's representation as such is sufficient to show that it had the authority and legal right to convey the properties. Accordingly, DWM's argument fails.

### 2. Due Diligence

DWM further contends that Smart Oil never provided it with the requisite due diligence materials, which constituted conditions precedent to enforce the November Agreement. These materials included: (1) title commitments; (2) "trailing 12-month

financials" for all of the properties; (3) inventories; and (4) financial records for the properties that were signed and certified by the property owners. Smart Oil's alleged failure to provide such materials thus resulted in its breach of the Agreement and DWM being relieved of its obligation to pay the Earnest Money Deposit.

Contrary to DWM's assertions, Smart Oil argues that it did provide DWM with the appropriate due diligence materials. It provided profit and loss statements, invoices, tax reports, and surveys. Smart Oil asserts that it also issued title commitments for each parcel of property included in the November Agreement and was prepared to deliver title to DWM at the close of the Agreement. While demonstrating Smart Oil's willingness to comply fully with and effectuate the Agreement, the extent to which certain materials were or were not handed over to DWM is beside the point.

The November Agreement dictates what actions DWM may take in the event certain due diligence investigations or materials are inadequate or to the dissatisfaction of DWM. In relevant part, Section 4(a)(i) of the Agreement provides:

> On or before the expiration of the Due Diligence Period, Buyer shall deliver to Seller; Buyer's written notice of its disapproval of its due diligence investigations for the Property. Buyer's failure to timely deliver such notice shall be deemed Buyer's approval of such investigations. If Buyer provides **timely written notice of its disapproval** of its due diligence investigations for these Properties, this **Agreement shall terminate and**

**the earnest money shall be returned** to Buyer by the Initial Escrow Agent.

(November Agreement 4 (emphasis added).) In layman's terms, the Agreement afforded DWM the right to provide written notice of disapproval of the purchase before the expiration of the Due Diligence Period. Such written notice would have nullified the Agreement and excused DWM from its obligation to pay the Earnest Money Deposit. However, DWM never provided such written notice. Its failure to do so converted any disapproval it had from its investigations to one of approval at the close of the Due Diligence Period. Moreover, DWM's obligation to pay the Earnest Money Deposit remained intact. DWM cannot now sidestep its obligation by arguing *ex post facto* that certain due diligence requirements were not met.

It is also important to note that Smart Oil was required to meet the conditions precedent not to enforce the Earnest Money Deposit but to consummate and enforce the entirety of the Agreement—the purchase and sale of the thirty parcels of property. These conditions included representations and warranties, described above, and the appropriate due diligence actions and materials currently discussed. To enforce the transfer of the Earnest Money Deposit, however, Smart Oil did not have as great a burden. Smart Oil's right to enforce the Earnest Money Deposit was dependent on DWM's right to conduct due diligence investigations

and notify Smart Oil of its disapproval therefrom, which DWM did not do. DWM's failure to exercise that right rendered it obligated to pay the Earnest Money Deposit in full, regardless of whether all conditions precedent were met to DWM's satisfaction and the parties ultimately consummated the Agreement. The language of the Agreement speaks for itself; for example: "Buyer's obligation to consummate the transaction contemplated by this Agreement are [sic] subject to the timely satisfaction or written waiver of the following conditions precedent for Buyer's benefit." (November Agreement 4.) This provision relates to the consummation of the transaction in its entirety, not the Due Diligence Period. The specific provisions governing the Due Diligence Period and the Earnest Money Deposit, recited earlier, do not make this same assertion. Instead, the emphasis is placed on DWM's right to provide notice of disapproval should it become dissatisfied with its due diligence investigations. It is only by providing notice of dissatisfaction that DWM can escape its obligation to pay the Earnest Money Deposit. DWM's argument thus holds no water.

In sum, Smart Oil has the authority and legal right to enforce the November Agreement, and any due diligence expectations it failed to meet were excused by DWM's failure to submit a written notice of disapproval. Therefore, by failing to pay Smart Oil the Earnest Money Deposit, DWM breached the November Agreement as a matter of law.

## B. Earnest Money Deposit

DWM argues that even if the November Agreement is enforceable, Smart Oil is not entitled to the Earnest Money Deposit—liquidated damages for $750,000.00. DWM asserts three theories to bolster its argument: (1) the Agreement's liquidated damages provision serves as a penalty, which is unenforceable under Illinois law; (2) even if the provision was enforceable, Smart Oil waived its right to enforce it; and (3) Smart Oil cannot enforce the provision because it is not a real party of interest to the Agreement. Each theory will be discussed in turn.

### 1. Liquidated Damages Provision

Under Illinois Law, while liquidated damages provisions are enforceable, penalty provisions are not. *G.K. Dev., Inc. v. Iowa Malls Financing Corp.*, 3 N.E.3d 804, 815-16 (Ill. App. Ct. 2013). Whether a provision for damages is a penalty clause or a liquidated damages clause is a question of law. *Id.* at 815. Generally, a liquidated damages provision in a real estate contract is enforceable when (1) the parties intended to establish an agreed upon amount of damages in the event of a breach; (2) the damages amount was reasonable at the time of contracting and bears some relation to the actual damages which might be sustained; and (3) the actual damages would be difficult to prove and uncertain in

amount. *Morris v. Flores*, 528 N.E.2d 1013, 1014 (Ill. App. Ct. 1988) (citation omitted).

Here, the pertinent portions of the liquidated damages provision in the November Agreement state:

> Except as otherwise specifically provided in this Agreement, the Earnest Money Deposit (the Deposit and the Additional Deposit) and all accrued interest thereon shall become nonrefundable to Buyer at the end of the Due Diligence Period, subject to the other conditions precedent for the benefit of the parties as set forth under this Agreement, and shall be applied toward the Purchase Price upon the Close of Escrow, or in the event of Buyer's default under this Agreement, shall be paid to Seller.
>
> If the Buyer defaults in its performance of any term, covenant, condition, or obligation under this Agreement, including the obligation of Buyer to purchase the Property if all conditions precedent to such obligations has been satisfied, Seller shall receive the entire Earnest Money Deposit and all accrued interest thereon as complete liquidated damages.
>
> IF, FOLLOWING THE EXPIRATION OF THE DUE DILIGENCE PERIOD AND FINANCING PERIOD AS APPLICABLE, BUYER FAILS TO CONSUMATE THIS TRANSACTION AND CLOSE THE ESCROW ON OR BEFORE THE CLOSING DATE (WITHOUT FAILURE OF ANY CONDITIONS PRECEDENT IN FAVOR OF BUYER), SELLER SHALL BE ENTITLED TO THE ENTIRE DEPOSIT DESCRIBED ABOVE, IT BEING UNDERSTOOD THAT THE DAMAGE TO SELLER CAUSED BY ANY SUCH DEFAULT OF BUYER WOULD BE EXTREMELY DIFFICULT TO OR IMPOSSIBLE TO ASCERTAIN. IN SUCH EVENT, SELLER SHALL BE RELEASED FROM ANY FURTHER OBLIGATION TO SELL THE PROPERTY TO BUYER AND ANY OTHER OBLIGATIONS UNDER THIS AGREEMENT, THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT. SELLER AND BUYER SHALL EACH INITIAL THIS SECTION WHERE INDICATED BELOW, CONSENTING AND AGREEING TO THE PROVISIONS HEREOF.

(November Agreement 14-15 (emphasis in original).) DWM asserts that this liquidated damages provision is unenforceable for three

reasons: First, the parties did not negotiate an amount for liquidated damages that would be fair or reasonable in the case of a breach, and so the $750,000.00 constitutes a penalty that was intended to punish DWM. Second, Smart Oil cannot establish that it anticipated incurring damages as a result of a breach by DWM or, at a minimum, that any damages would be difficult to ascertain. Third, there are no escrow funds to recover. All three contentions miss the mark.

As a preliminary matter, the Court finds that both parties intended to agree upon an amount for damages in the case of a breach. Where a liquidated damages provision is clear and unambiguous on its face, "the parties' intent must be determined solely from the language of the agreement itself, and it is presumed that the parties inserted each provision deliberately and for purpose." *Jameson Realty Group v. Kostiner*, 813 N.E.2d 1124, 1133 (Ill. App. Ct. 2004). The key contractual provisions, recited above, clearly and unambiguously state that "Seller shall receive the entire Earnest Money Deposit and all accrued interest thereon as complete liquidated damages." (November Agreement 14-15.) Directly below the provision, the Agreement required the signatures of both parties. (*Id.*) Both parties signed as to this specific provision, and the Court finds these signatures suffice to show that the parties intended to establish an agreed upon

amount of damages in the event of a breach. *Morris*, 528 N.E.2d at 1014.

The Court now turns to DWM's first argument—that the parties did not negotiate an amount for liquidated damages that was fair and reasonable, and so the liquidated damages provision constitutes a penalty. The liquidated damages provision provided for the payment of $750,000.00 to Smart Oil in the event of a breach by DWM. DWM does not do much by way of supporting its argument other than reasserting that the amount of damages was unreasonable. It also states that "[i]n *J.F. McKinney,* the court determined that a $4.3 million figure was not an accurate prediction of damages." (Def.'s Mot. for Summ. J. 5, Dkt. No. 76.) The Court cannot find the mentioned case, but presumes that DWM is referring to *G.K. Dev., Inc. v. Iowa Malls Fin. Corp.*, 3 N.E.3d 804 (Ill. App. Ct. 2013). Even considering *G.K. Development Inc.,* however, the Court finds DWM's argument unfounded. In that case, the court held that "the parties negotiated a $4.3 million holdback, which represented the entire, present-day value of the 20-year lease, in the event that the lease did not go through . . . The holdback amount of $4.3 million simply does not bear any relation to the damages sustained for a 91-day delay in securing permits and, therefore, was not a reasonable prediction of damages." *Id.* at 817. Here, the liquidated damages provision constitutes approximately one percent of the purchase price of $67

million, as opposed to 100 percent of the present value of the lease at issue in *G.K. Development Inc.* The $750,000.00 in liquidated damages was reasonable, and as such, does not constitute a penalty.

The Court next turns to Smart Oil's ability to ascertain damages. "Where damages for breach of contract would be uncertain or difficult to calculate, [the Illinois Supreme Court] has upheld a reasonable amount stipulated at the time of contracting as liquidated damages without regard to actual damages." *Karimi v. 401 North Wabash Venture, LLC*, 952 N.E.2d 1278, 1289 (Ill. App. Ct. 2011) (citation omitted). Moreover, "[p]arties often include liquidated damages provisions in real estate transactions to avoid the difficulty of ascertaining and proving damages by such methods as market value, resale value or otherwise." *Id.* at 1285 (internal quotation marks and citation omitted); *see also Berggren v. Hill*, 928 N.E.2d 1225, 1231 (Ill. App. Ct. 2010) (finding that "at the time of contracting, the potential damages to either party were uncertain and it was reasonable for them to bargain over the terms of [the liquidated damages] provision to avoid the difficulty of ascertaining losses in the event of a breach"); *see also Siegel v. Levy Org. Dev. Co.*, 538 N.E.2d 715, 716 (Ill. App. Ct. 1989) (finding enforceable the liquidated damages of $320,000 of earnest money paid toward the purchase of a $1.6 million condominium). Finally, when determining whether actual damages would be

uncertain in amount and difficult to prove, courts look to the time of contracting, not the time of breach. *Jameson*, 813 N.E.2d at 1130.

Here, the November Agreement explicitly stated that damages would be difficult to ascertain. In relevant part, the Agreement provides, "SELLER SHALL BE ENTITLED TO THE ENTIRE DEPOSIT DESCRIBED ABOVE, IT BEING UNDERSTOOD THAT THE DAMAGE TO SELLER CAUSED BY ANY SUCH DEFAULT OF BUYER WOULD BE EXTREMELY DIFFICULT TO OR IMPOSSIBLE TO ASCERTAIN." (November Agreement 14 (emphasis in original).) DWM signed directly beneath this provision, agreeing to the assertion that damages were unascertainable. But now DWM argues otherwise.

In any case, given the magnitude of the transaction—thirty parcels of property for the purchase price of $67 million—ascertaining damages would prove difficult in the event of a breach. Moreover, whether Smart Oil did in fact suffer damages due to a breach is beside the point. The Court must look to the time of contracting, and during that time, it finds, as the terms of the Agreement itself dictates, that any ensuing damages would be difficult to ascertain. *Id.* Lastly, as discussed above, both the amount of damages—$750,000.00—and the incorporation of such damages in the November Agreement were reasonable to avoid such difficulty in ascertaining losses at some later point in time. *Berggren*, 928 N.E.2d at 1231. Accordingly, the liquidated damages provision was appropriate under the circumstances.

Finally, as to DWM's third contention, the fact that there are no escrow funds to recover does not preclude Smart Oil from receiving liquidated damages. DWM primarily relies on *Cutielletta v. Griffin*, No. 113429-U (Ill. App. Ct. 2012), which the Court notes was filed under Illinois Supreme Court Rule 23. That rule prohibits citing such orders as precedent. Regardless, the reasoning in that case is also inapplicable here. In *Cutielletta,* the court refused to award the plaintiffs the earnest money, which was never deposited in escrow, because "the contract did not contain any language which explained that the escrowee was to pay the seller if the final earnest money was not deposited in escrow when the buyers defaulted by terminating the contract." *Id.* at ¶ 60. Here, however, the liquidated damages provision explicitly states that "Seller shall receive the entire Ernest Money Deposit and all accrued interest thereon as complete liquidated damages." (November Agreement at 14-15.) The terms of the contract itself determine the result. DWM's argument thus fails.

In sum, Smart Oil has satisfied the requirements for upholding the liquidated damages provision of the November Agreement. The Court next considers whether Smart Oil waived its right to invoke that provision and if it did not, whether it is the appropriate party of interest to do so.

## *2. Waiver*

DWM contends that even if the liquidated damages provision is enforceable, Smart Oil's conduct effectively terminated or waived enforcement of it. In support of its argument, DWM asserts that it exchanged multiple emails with Smart Oil that ultimately extended the Due Diligence Period and, after a certain point, even terminated the November Agreement. Moreover, DWM argues that at no time during the pendency of the Agreement did Smart Oil demand the Earnest Money Deposit, thereby waiving Smart Oil's right to enforce the liquidated damages provision now. The Court, however, disagrees that any of the foregoing conduct terminated or waived enforceability of the provision.

As provided for in the November Agreement, the Due Diligence Period closed on November 30, 2014. In its brief, DWM cites to an email dated November 28, 2014, to support its proposition that the parties extended that deadline. (Ex. F to Def.'s Mot. for Summ. J., Dkt. No. 75-6.) This email, however, was written by DWM's attorney, requesting a 2-week extension and offering to prepare a formal, written extension if Smart Oil agreed. (*Id.*) Curiously absent from the record or DWM's brief, however, is any email by Smart Oil having agreed to or approved such extension for purposes of excusing DWM's obligation to pay the Earnest Money Deposit.

Instead, DWM relies on subsequent emails dated from January through May 2015, which demonstrate that DWM and Smart Oil

continued negotiations of the transaction's close. But continued negotiations do not mean that Smart Oil extended the Due Diligence Period. Further, the Agreement's subsequent termination does not excuse DWM from its obligation to pay the Earnest Money Deposit. Specific to the liquidated damages provision, the Agreement states, "THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT." (November Agreement 15.) As explained earlier, DWM's obligation is waived only if DWM, as a result of its due diligence investigations of the properties, provided written notice of its disapproval of the purchase. DWM did not provide such notice, so its obligation remains.

Smart Oil also did not waive its right to liquidated damages. On the contrary, on March 11, 2015, Smart Oil demanded DWM remit the Earnest Money Deposit by March 16, 2015. (Ex. L to Def.'s Mot. for Summ. J., Dkt. No. 75-12.) DWM did not do so, and then Smart Oil brought this suit. DWM's assertion is a baseless one, and the Court fails to find on any other grounds that Smart Oil waived its right. Accordingly, DWM's arguments fails.

### 3. *Real Party in Interest*

In a final attempt to thwart Smart Oil's ability to recover damages, DWM complains that Smart Oil is not the real party in interest. DWM argues that Smart Oil assigned to the property owners its rights to DWM's escrow deposit and thus lacks standing to bring this suit.

The real party in interest is defined as "the person or entity entitled to the benefits if the action is successful. In other words, the real party in interest has an actual and substantial interest in the subject matter of the action, as distinguished from one who has only a nominal, formal, or technical interest in, or connection with, the case." *Lyons v. Ryan*, 780 N.E.2d 1098, 1102 (Ill. App. Ct. 2002) (internal quotation marks and citation omitted). In the instant case, it is Smart Oil that initiated negotiations and sought to transact the sale of the properties. DWM contracted with Smart Oil; the property owners were not parties to the November Agreement. Smart Oil did enter into separate contracts with the property owners, but these contracts mirrored the November Agreement and did not assign Smart Oil's rights over to the owners. (Ex. J to Def.'s Mot. for Summ. J., Dkt. No. 75-10.) DWM's argument holds no water. Smart Oil is the "real party in interest" and has standing to bring this suit.

In sum, DWM has failed to show that it is entitled to summary judgment as to Count I of both Smart Oil's Complaint and DWM's Counterclaim. DWM breached the November Agreement as a matter of law; thus, Smart Oil is entitled to summary judgment as to Count I of its Complaint.

### C.  Smart Oil's Declaratory Judgment Claim (Count II)

For sake of completeness, the Court finds moot Count II of Smart Oil's Complaint—declaratory judgment against Zwick. By way

of stipulation, Zwick was dismissed from the instant lawsuit. Moreover, both parties agree that Zwick does not hold any funds to remit. Accordingly, Count II fails as a matter of law.

### D. DWM's Fraudulent Inducement Claim

As a final matter, in Count II of its Counterclaim, DWM asserts that it was fraudulently induced to enter the November Agreement. "Fraudulent inducement is a form of common-law fraud." *Avon Hardware Co. v. Ace Hardware Corp.*, 998 N.E.2d 1281, 1287 (Ill. App. Ct. 2013) (citing *Lagen v. Balcor Co.*, 653 N.E.2d 968, 973 (Ill. App. Ct. 1995)). To establish fraud, DWM must show: (1) a false statement of material fact; (2) knowledge or belief by Smart Oil that the statement was false; (3) an intention to induce DWM to act; (4) reasonable reliance upon the truth of the statement by DWM; and (5) damage to DWM resulting from this reliance. *Id.*

DWM contends that Smart Oil knowingly made false statements concerning its ability to effectuate a sale under the November Agreement. Smart Oil supposedly made such false statements intentionally to induce DWM to enter the Agreement, and as a result, DWM suffered damages in its effort to consummate the transaction. DWM's arguments, once again, are wanting and misguided.

Construing the facts in the light most favorable to Smart Oil, the record shows that the property owners were willing and ready to sell their properties to DWM. To reiterate, the owners

provided sworn statements affirming their preparedness to effectuate the sale of their properties under the November Agreement. They authorized Smart Oil to purchase their properties, understanding that Smart Oil would then "flip" the properties to a subsequent buyer. As the Court established above, Smart Oil had permission and authorization to sell the properties, and as far as the Court can determine, Smart Oil was ready to close the transaction if DWM pursued as much. There is not much, if anything at all, by way of showing that Smart Oil fraudulently induced DWM to enter into the November Agreement. Accordingly, DWM's fraudulent inducement claim fails as a matter of law.

### III. <u>CONCLUSION</u>

For the reasons stated herein, DWM's Motion for Summary Judgment (Dkt. No. 74) is denied, and Smart Oil's Motion for Summary Judgment (Dkt. No. 71) is granted as to Count I of the Complaint. Count II of the Complaint is moot.

**IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: 1/29/2019